The **NORTHWESTERN MUTUAL LIFE, INSURANCE COMPANY**, Plaintiff,

v.

**ATLANTIC RESEARCH CORPORATION, et al.,** Defendants.

Civ. A. No. 93–1347–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 29, 1994.

Barbara Susan Wahl, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiff.

Charles Morton English, Jr., Ober, Kaler, Grimes & Shriver, Blair Gerard Brown, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC, Nathaniel Thomas Connally, III, Hogan & Hartson, McLean, VA, Craig Alan Hoover, Hogan & Hartson, Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

In this CERCLA[1] case, plaintiff, the holder of a mortgage on certain property, seeks to recover from defendants, current and former owners and occupiers of the property, the costs incurred for certain environmental

---

1. The Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*

studies of the property. Plaintiff contends these studies were necessary because toxic materials were used and stored on the property for more than thirty years. Also sought by plaintiff is a declaratory judgment for costs yet to be incurred on further studies of the property, as well as any required remediation.

The question presented at this stage of the proceeding is whether the current record warrants the entry of summary judgment for plaintiff on any or all of the elements necessary for establishing defendants' joint and several liability under CERCLA. For the reasons that follow, summary judgment for plaintiff is appropriate with respect to some, but not all, of these elements and hence, plaintiff's motion is granted in part and denied in part. Left for trial are whether plaintiff's costs were necessary, as required under § 9607(a)(4)(B), and whether they were reasonable in the circumstances.

## II.

This is a dispute over costs already incurred and yet to be incurred for environmental studies and remediation of 19.952 acres of property and attached structures located at 5390–5400 Cherokee Ave., Alexandria, Virginia. From 1959 through 1991, this property was used for a variety of research activities, including the testing and development of solid propellants for rockets, as well as the performance of nuclear isotope experiments. These activities resulted in discharges and releases of various chemical substances and waste materials, which contaminated the property with significant levels of hazardous substances, including tetrachloroethylene (also known as "perchloroethylene" and abbreviated as "PCE"), trichloroethylene ("TCE"), and certain radioactive materials.

Over the thirty-two year period in question, the property consisted of several buildings, greenhouses, trailers, and surrounding grounds. Research was conducted and wastes were stored in the buildings and trailers. Nuclear isotope experiments were conducted in the greenhouses, while a storage shed on the grounds was used at various times to store radioactive materials and PCBs. Underground tanks on the property, which were ultimately removed, were used to store gasoline. The parking lots where the trailers were located were also used to store drums filled with coal and with chemical waste.

The identity of the users and owners of the property changed over the thirty-two years in issue. From 1959 to 1966, the original Atlantic Research Corporation, a Virginia corporation ("ARCV"), was the lessee of the property, with full authority to control activities on the property. In 1966, ARCV purchased the property [2] and continued to occupy and use it for another year. Then, in December 1967, defendant Susquehanna Corporation [3] bought all the outstanding shares of ARCV and merged ARCV into Susquehanna, thereby making Susquehanna the owner and occupier of the property. Susquehanna's Propulsion Division engaged in the same research and development activities as ARCV had engaged in prior to the merger, including specifically the testing and development of solid propellants for sophisticated small rockets and gas generators, as well as nuclear isotope experiments. Thus, from December 1967 through March 1972, Susquehanna was the owner and occupier of the property with full authority to control activities on the property.

In March 1972, Susquehanna transferred certain of its assets to the second Atlantic Research Corporation ("ARC"), a subsidiary of Susquehanna incorporated in 1968 in Delaware. The transferred assets included those involved in the research activities conducted on the property. Ownership of the property was not transferred; it remained with Susquehanna. ARC leased portions of the property from its parent, Susquehanna, and continued on these portions of the property the research activities formerly conducted by Susquehanna.

In January 1973, Susquehanna transferred ownership of the property, subject to leases,

---

**2.** The party from whom ARCV purchased the property is not identified in the record. This omission is not material to the issues presented.

**3.** Defendant Susquehanna Corporation has not appeared in this case and is in default.

to another of its subsidiaries, defendant Susquehanna Properties, Inc. (SPI).[4] SPI thus became the owner-lessor of the property, with ARC as its tenant. SPI later sold the property to defendant RS Company (RS) and assigned to RS its interest in the ARC lease. In connection with its purchase of the property from SPI, RS executed a promissory note to plaintiff and plaintiff acquired a mortgage on the property. In late 1991, RS defaulted on its promissory note to plaintiff.

At the end of 1991, ARC's lease with RS expired and ARC left the property. Before its departure, ARC hired a firm (Remcor) to perform environmental studies of the property. ARC also engaged in clean-up operations to remove some of the environmental pollutants. ARC shared both the Remcor report and the result of its remediation efforts with RS and with plaintiff. ARC claims it spent in excess of $515,000 on the environmental studies and remediation efforts.

Concerned about the extent of contamination on the property, plaintiff chose not to foreclose on its mortgage and take title to the property following RS's default on the note.[5] Instead, as the holder of the deed of trust encumbering the property, plaintiff chose to hire two firms, Law Engineering and CH2M Hill, to conduct environmental studies of the property. The Law Engineering study was a modest, preliminary study. More exhaustive, the CH2M Hill study analyzed over 950 samples of soil, groundwater, air, and radiation emissions. Those samples confirmed the release onto the property of numerous hazardous substances.[6] As of August 1993, plaintiff had incurred $499,990.29 in technical costs and $139,763.00 in legal costs related to the environmental investigations of the facility. Plaintiff seeks to recover these costs and also requests a declaratory judgment establishing responsibility for costs that may be reasonably and necessarily incurred.

## III.

■ Summary judgment must be entered when "there is no genuine issue as to any material fact" and therefore "the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A fact is material when proof of its existence or nonexistence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the nonmoving party on the basis of such issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, disposition by summary judgment is appropriate when the evidence, taken as a whole and viewed in the light most favorable to the party opposing the motion, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In this regard, the moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ Significantly, summary judgment need not be withheld simply because some, but not all, aspects of a claim present triable issues. On the contrary, as the Rule itself makes clear, summary judgment is appropriate for "any part" of a claim that presents no triable issues. Rule 56(a), Fed.R.Civ.P. And "any part" means any portion of the liability or the damages aspects of a claim. This feature of Rule 56 is particularly useful in CERCLA actions because these typically complex, multiparty matters involve numer-

---

**4.** Defendant Susquehanna Properties, Inc. has not appeared and is default.

**5.** Consequently, although RS has made no payments to plaintiff since October 1991, RS remains the fee simple owner of the property.

**6.** The CH2M Hill remedial investigation established the existence of 1–1 dichloroethylene ("1–1 DCE"), 1–2 dichloroethylene ("1–2 DCE"), 1–1–1 trichloroethylene ("TCA"), TCE, PCE, and chronium in the groundwater at the facility.

CH2M Hill also found 1–1 DCE, 1–2 DCE, TCE, PCE, 1–2 dichlorobenzene, polychlorinated biphenyls ("PCBs"), bis (2-ethylhexyl) phthalate, phenanthrene, fluoranthene, naphthalene, benzo (a) anthracene, benzo (a) pyrene, chromium, and strontium–90 and other radionuclide beta-gamma emitters in the soils and/or buildings of the facility. All of the substances or materials listed are "hazardous substances" within the meaning of 42 U.S.C. § 9601(14).

ous liability and damages issues, some of which are often amenable to summary disposition. In CERCLA cases, therefore, summary judgment provides an efficient means of "narrowing the issues at each phase, by avoiding remedial questions if no liability attaches, and by potentially hastening remedial action or settlement discussions once liability is determined." *Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1274 (E.D.Va.1992) (citing *Amoco Oil v. Borden, Inc.*, 889 F.2d 664, 667–68 (5th Cir.1989)). It remains to apply these summary judgment principles to the CERCLA claim at bar.

### IV.

■ To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (i) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (ii) that a release or threatened release of a hazardous substance has occurred on the site; (iii) that the release or threatened release has caused plaintiff to incur response costs; and (iv) that each defendant falls within one of the categories of "liable parties" set forth in 42 U.S.C. § 9607(a). *See City of North Miami v. Berger*, 828 F.Supp. 401, 407 (E.D.Va.1993); *Chesapeake and Potomac Telephone*, 814 F.Supp. at 1274.

### A. *Facility*

CERCLA defines "facility" as including any "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or [has] otherwise come to be located." 42 U.S.C. § 9601(9). The expansiveness of this definition is well recognized. *See United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C.1985) ("The definition of facility is broad enough to encompass ... virtually any place at which hazardous wastes have been dumped or otherwise disposed of."). Given this expansive definition, it seems clear that the 19.952 acres, throughout which hazardous wastes have been found, constitute a "facility" under CERCLA.

■ ARC disputes this result, arguing instead that sections of the 19.952 acres of property should not be considered part of the "facility" for which ARC might incur CERCLA liability. ARC bases its argument on the notion that it is potentially liable only for discharges traceable to ARC activities. This argument misreads CERCLA and misapprehends its scheme. In the words of the Fourth Circuit, "[t]he trigger to liability under [CERCLA] is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 846 (4th Cir.1992). Put another way, CERCLA liability does not rest on "traditional tort notions of causation, but rather [is imposed] merely [on the basis of] a nexus requirement." *Louisiana Pac. Corp. v. Beazer Materials & Servs.*, 811 F.Supp. 1421, 1430 (E.D.Cal.1993). And that nexus requirement plainly exists here with respect to ARC as the uncontradicted record discloses that ARC was a lessee and an operator of the property. See Part IV.D. *infra.* That ARC leased only a portion of the property is immaterial to defining the scope of the "facility."[7] What matters for purposes of defining the scope of the facility is where

---

7. While immaterial to the "facility" issue, ARC's arguments regarding allocation of responsibility may be pertinent at the contribution phase of the proceeding. Section 113 of CERCLA specifically provides for actions for contribution, instructing courts to use "such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Factors which may be considered include:

1. The ability of the parties to distinguish their contribution to the discharge, release, or disposal of hazardous waste;
2. The amount of the hazardous waste involved;
3. The degree of the toxicity of the hazardous waste involved;
4. The degree of care exercised by the parties with respect to the hazardous waste concerned; and
5. The degree of cooperation by the parties with government officials to prevent any harm to the public health or the environment.

*Weyerhaeuser Co. v. Koppers Co., Inc.*, 771 F.Supp. 1420, 1426 (D.Md.1991). Other factors to be considered include the parties' knowledge and/or acquiescence in the contaminating activities and the parties' benefits from the contaminating activities. *Id.* Thus, the contribution stage, and not the liability stage, is appropriate for considerations of the parties' relative degree of fault.

the hazardous substances were "deposited, stored, disposed of, ... or *[have] otherwise come to be located."* 42 U.S.C. § 9601(9) (emphasis added). And in this regard, the uncontradicted record confirms that hazardous substances exist in the soil, the groundwater, and the structures in all quadrants of the property.[8] It follows, therefore, from these facts and from CERCLA's plain language that the entire 19.952 acres is a "facility" because contaminants have come to be located throughout the property.

### B. *Release of Hazardous Substances*

■ Nor can there be any doubt that a "release" of "hazardous substances" has occurred on the property. CERCLA defines "release" as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ...

42 U.S.C. § 9601(22). The fact that hazardous substances exist in the soil and groundwater in all quadrants of the property indicates that these substances have been spilled, leaked, emitted, discharged, leached, etc., into the environment. As one district court correctly put it, "[g]iven the breadth of CERCLA, it seems virtually impossible to conceive of a situation where hazardous substances are found in the soil and not *ipso facto* 'released' into the environment." *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 341 (D.Md.1993). In short, the record here leaves no doubt that a CERCLA "release" of hazardous substances has occurred on the property.

### C. *The Release or Threatened Release Caused Plaintiff to Incur Response Costs*

■ "Response costs," under CERCLA, are costs incurred in connection with the cleanup and remediation of hazardous substances contamination. 42 U.S.C.

§ 9607(a)(4). CERCLA defines "response" as "remove, removal, remedy, and remedial action" including "enforcement activities related thereto." 42 U.S.C. § 9601(25). The term "removal," in turn, is broadly defined in CERCLA as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to *monitor, assess, and evaluate* the release or threat of release of hazardous substances, disposal of removed substances, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release....

42 U.S.C. § 9601(23) (emphasis added).

■ Here, plaintiff claims two types of costs as "response costs": (1) investigatory costs and (2) attorneys' fees. The investigatory costs plaintiff claims are those incurred in paying two qualified firms to conduct environmental studies of the facility. Under CERCLA's expansive definition of "removal," it follows that a "response" includes environmental studies of a facility undertaken to "monitor, assess, and evaluate" the release of hazardous substances. Thus, costs incurred for purposes of evaluation and investigation, such as the studies undertaken by plaintiff, qualify as "response costs." *See, e.g., HRW Systems*, 823 F.Supp. at 342–43; *Artesian Water Co. v. Gov. of New Castle County*, 659 F.Supp. 1269, 1286–87 (D.Del.1987).

■ Seeking to avoid this result, ARC argues that plaintiff is not entitled to summary judgment on this element because there is no proof that ARC's actions caused the releases in question. This argument misconstrues CERCLA.[9] Tort causation princi-

---

**8.** Specifically, the record discloses that PCE, TCE, TCA, PCBs, radionuclides, and heavy metals are found throughout the property in the soil, the groundwater, and the buildings and structures.

**9.** ARC's cited authorities, *White v. County of Newberry*, 985 F.2d 168, 170 (4th Cir.1993); *Ded-*

*ham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1154 n. 8 (1st Cir.1989); and *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1283 (D.Del.1987), aff'd, 851 F.2d 643 (3rd Cir.1988), are inapposite. All are "multiple-site" cases raising the issue whether a plaintiff must show that the

ples are immaterial to CERCLA liability.[10] Instead, under CERCLA, "the occurrence of the statutorily-specified event," namely the release of hazardous substances, creates liability for "any party falling within a class defined in section 9607(a)." *Louisiana–Pac. Corp. v. Beazer Materials and Servs.*, 811 F.Supp. 1421, 1427 (E.D.Cal.1993). Therefore, CERCLA does not require a plaintiff to show that a particular defendant actually caused the release of hazardous substances; rather, CERCLA only requires that a plaintiff establish that a release occurred and that each defendant qualifies as a liable party under the statute. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 264 (3rd Cir.1992).

The second type of response costs plaintiff seeks is attorneys' fees and expenses. Because the caselaw is divided on this issue,[11] and because the issue is currently before the Supreme Court,[12] it is appropriate to defer ruling on this question, pending the Supreme Court's imminent resolution of the issue.

D. *Liable Parties under CERCLA*

■ Where, as here, a plaintiff establishes that a release or threatened release of hazardous substances has occurred at a facility and that the release or threatened release has caused plaintiff to incur response costs, CERCLA imposes liability on the current owner and operator of the contaminated facility, as well as on any owner or operator of the facility at any time disposal of any hazardous substances occurred. 42 U.S.C. § 9607(a)(1)–(2). It is undisputed that RS Company, Susquehanna, and SPI are all potentially liable under CERCLA as past and present "owners" of the facility. The only dispute, therefore, concerns the liability of ARC. Two theories compel the conclusion that ARC is a liable party under CERCLA: (1) operator liability and (2) successor liability.

■ Operator liability under CERCLA arises where an occupier or user of a facility has the "authority to control" activities on the facility. *See United States v. Carolina Transformer Co.*, 978 F.2d 832, 836–37 (4th Cir.1992); *City of North Miami v. Berger*, 828 F.Supp. 401, 409 (E.D.Va.1993). The "authority to control" standard is sensibly based on the notion that an occupier or user of a facility with authority to control the facility is in a position to prevent or abate environmental harm.

Record facts convincingly confirm ARC's authority to control the facility. To begin with, ARC leased a substantial amount of the building space at the facility. Importantly, this lease included the "lime pit," a chemical storage area contaminated with PCE, TCE, and beryllium, all substances used by ARC in its activities as lessee of that portion of the property. ARC's lease also included the "Hot Lab," a laboratory in which nuclear isotope experiments were conducted, the "Hot Cell," an area for storage of radioactive materials,[13] and the "over the hill" building.

source of a release was one of several possible sites. This issue is not dispositive of, nor relevant to, the determination whether a plaintiff must show that the actions of a particular operator at a facility led to a release when the origin of the release is not in question. Furthermore, both *Dedham Water* and *Artesian Water* hold that plaintiffs do not need to show that a particular defendant's actions were responsible for the release. *See Dedham Water*, 889 F.2d at 1154; *Artesian Water*, 659 F.Supp. at 1282–83.

10. *See* note 7 *supra* and accompanying text.

11. The split in authority on this question is widespread, extending even to courts within this district. *Compare Board of Supervisors of Fauquier County v. Fiberglass Engineering Co.*, C.A. No. 89–1454–A (E.D.Va.1990) (holding that attorneys' fees are not recoverable in a CERCLA cost recovery action) *with Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1281

(E.D.Va.1993) (holding that attorneys' fees are recoverable under CERCLA).

12. The pending case is a joint appeal of decisions by two separate panels of the Ninth Circuit Court of Appeals in *Key Tronic Corp. v. United States*, 984 F.2d 1025 (9th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 633, 126 L.Ed.2d 592 (1993) and *Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir.1993), *cert. granted sub nom. Key Tronic Corp. v. United States*, —— U.S. ——, 114 S.Ct. 633, 126 L.Ed.2d 592 (1993). Both cases held that attorneys' fees were not recoverable under the American Rule.

13. Further evidence of ARC's authority to control these areas is the fact that ARC applied for and received licenses from the Nuclear Regulatory Commission to store nuclear materials in the Hot Cell and to use radioactive materials in the Hot Lab.

All of these areas are locations where releases of hazardous materials have occurred.

 Nor is evidence of ARC's "authority to control" limited to the leased portions of the facility. Actual authority is also relevant to establishing "authority to control" under CERCLA,[14] and the record discloses that ARC's actual control extended well beyond just the leased portions of the facility. Evidence of ARC's actual control over unleased portions of the facility include ARC's installation of underground storage tanks for gasoline under the west parking lot, maintenance of laboratory trailers on the parking lot and elsewhere on the grounds, storage of drums of chemical waste and barrels of coal on unleased portions of the property, and construction of greenhouses on unleased portions of the property for use in experimenting with composting "explosives contaminated lagoon sludge" and nuclear isotopes. These facts clearly establish that ARC had the authority to control unleased portions of the facility.

 Yet another ARC argument is that CERCLA liability requires that authority to control exist at and during the time when human activity led to the discharge of contaminants. Again, ARC misconstrues the CERCLA scheme. "Disposal" is defined in CERCLA through reference to the term's definition in the Resource Conservation and Recovery Act (RCRA), wherein

> [t]he term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). In *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir.1992), the Fourth Circuit construed this definition, finding that "disposal" under CERCLA does not require active human conduct. Therefore, the panel held that

CERCLA § 9607(a)(2) imposes liability not only for active involvement in the 'dumping' or 'placing' of hazardous waste at the facility, but also for ownership or operation of the facility at any time the hazardous materials spill, leak, leach, or escape into the environment. *Nurad*, 966 F.2d at 846. As *Nurad* makes clear, CERCLA liability is triggered by ownership or operation, not by direct culpability for a release or contamination. And there is no doubt from the record that hazardous materials were spilling, leaking, leaching, or escaping into the environment at the facility during the time of ARC's tenancy. It is immaterial whether ARC itself was directly responsible for the contamination.

In any event, ARC was not an innocent tenant, far removed from the area of contamination and powerless to effect remedial cleanup. Instead, ARC not only had the authority to control the contaminated areas, but had actual control over the area and was directly engaging in activities which contributed to the release of hazardous materials. These facts differentiate the case at bar from *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir.1992); *cert. denied sub nom. Mumaw v. Nurad, Inc.*, —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), a case on which ARC relies. In *Nurad*, the owner was denied reimbursement from tenants for costs incurred in removing underground storage tanks ("USTs") because the tenants did not have authority over the USTs or their contents. As proof of this lack of authority, the *Nurad* panel pointed to the landlord's practice under which a separate lease agreement was required if a tenant sought to use one of the tanks. The panel noted that "the tenant defendants may even have been trespassing if they had attempted to assume the role of 'operator' of the USTs." *Nurad*, 966 F.2d at 843–44. These facts contrast sharply with those at bar, in which ARC had access to, and authority over, a majority of the facility, including areas where releases of hazardous materials occurred. For this reason, ARC was an operator of the facility for the purposes of CERCLA and qualifies as a liable party under the statute.

---

14. *See North Miami*, 828 F.Supp. at 410 (recognizing the exercise of actual control as clear evidence of authority to control).

■ The second theory under which ARC is liable in the instant case is successor liability. Under this theory, ARC, a successor to Susquehanna, acquires Susquehanna's liability for the costs incurred by plaintiff.[15] The standard for establishing successor liability in the Fourth Circuit is set forth in *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir.1992)[16]:

> The settled rule is that a corporation which acquires the assets of another corporation does not take the liabilities of the predecessor corporation from which the assets are acquired unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is fraudulent.

ARC is a successor corporation to Susquehanna under two of these exceptions. First, ARC impliedly assumed Susquehanna's liabilities in the Asset Purchase Agreement of 1972 by which Susquehanna transferred certain assets, including those located at the facility, to ARC, its subsidiary. Specifically, the Agreement provided that the liabilities ARC assumed from Susquehanna excluded those arising prior to September 8, 1970.[17] The inescapable inference is that ARC assumed Susquehanna's liabilities arising from activities of Susquehanna's "AR Group" after September 8, 1970.[18] The terms of this agreement clearly imply that ARC does assume some of the liabilities of Susquehanna, specifically those arising out of the operations of the AR Group arising *after* September 8, 1970. This express assumption of liability could be used to show that ARC did assume liability as a successor corporation to Susquehanna with respect to the activities of the AR Group after September 8, 1970.

Even clearer is the application of the "mere continuation" exception. The traditional view of the "mere continuation" exception held that a corporation was not a successor corporation unless, after the transfer of assets, only one corporation remained and there was an identity of stock, stockholders, and directors between the two corporations. *Carolina Transformer*, 978 F.2d at 838. A second interpretation, however, has been adopted by courts and was followed in *Carolina Transformer*. This view, referred to as the "continuity of enterprise" or "substantial continuity" approach, requires consideration of eight factors to determine successorship:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

*Carolina Transformer*, 978 F.2d at 838. Application of these factors here points persuasively to the conclusion that ARC is a successor to Susquehanna. Many key Susquehanna personnel, particularly key supervisory personnel, were retained by ARC. It is clear that ARC continued on the property the same production and research activities con-

---

**15.** Because Susquehanna was the undisputed owner of the facility during periods when discharges occurred, Susquehanna's liability under CERCLA is clear.

**16.** In *Carolina Transformer,* the Fourth Circuit, applying these principles, found there was successor liability under CERCLA.

**17.** This portion of the Agreement reads as follows:

There shall be excluded from liabilities of the AR Group to be assumed by ARC hereunder all liabilities presently outstanding or hereinafter incurred under legal actions which arise or arose out of the operations of the AR Group prior to September 8, 1970.

**18.** Susquehanna's "AR Group" was made up of two division, the Propulsion and Electronics and Communications Divisions. The former occupied the property at issue and engaged in the same research and development activities later performed by ARC.

ducted by Susquehanna using Susquehanna's production facilities. Further, ARC received its assets from Susquehanna and held itself out as the continuation of Susquehanna (which was the successor of ARCV); even today, ARC's letterhead proclaims "High Technology leadership since 1949"—the same year ARCV was incorporated. In sum, ARC used many of the same people to do the same work as Susquehanna, while holding itself out as a continuation of Susquehanna. Thus, ARC is liable under CERCLA as a successor corporation to Susquehanna, which is itself liable as an owner/operator.

## V.

■ Although plaintiff is entitled to summary judgment against all defendants on the predicate issues of "facility," "release," expenditure of "response costs," and defendants' liability under CERCLA, it is not entitled to summary judgment on damages. In order to establish damages under CERCLA § 107, a plaintiff must show that the response costs incurred were necessary and consistent with the National Contingency Plan (NCP) as required under § 9607(a)(4)(B), as well as reasonable under the circumstances.

Although some circuits have required a showing that response costs are necessary and consistent with the NCP in order for a plaintiff to gain summary judgment on liability, this Court held otherwise in *City of North Miami v. Berger*, 828 F.Supp. 401 (E.D.Va. 1993).[19] As yet, the Fourth Circuit has not spoken on this issue. Accordingly, this Court follows its decision in *North Miami*, which held that "at the liability stage, [the plaintiff] need only establish the fact that it has incurred *some* costs in responding to the release of hazardous substances, not the precise amount of the costs or their reasonableness." *North Miami*, 828 F.Supp. at 408.[20] Once a plaintiff has crossed that threshold, a court is then free to determine whether CERCLA liability exists under the elements set forth above. *See North Miami*, 828 F.Supp. at 408–09. Here, there is no question that plaintiff has incurred some costs in responding to the release of hazardous substances at the facility. Consequently, analysis of defendants' liability under CERCLA on the other elements is proper, whether or not plaintiff can establish on summary judgment that its response costs were necessary and consistent with the NCP.

■ Nevertheless, the question remains whether plaintiff can establish that its costs were necessary and consistent with the NCP for the purposes of summary judgment. The NCP is authorized by 42 U.S.C. § 9605 and is set out at 40 C.F.R. pt. 300 (1992). Included in the NCP is authorization for a remedial preliminary assessment ("PA") and a remedial site inspection ("SI"). 40 C.F.R. § 300.-420. Under the NCP, a PA shall "consist of a review of existing information about a release ..." and "[a] recommendation ... whether an SI or removal action or both should be undertaken." *Id.* An SI, in turn, shall "build upon the information collected in the remedial PA" and "shall involve, as ap-

---

**19.** CERCLA § 113(g)(2) offers some support for placing the "necessary" and "consistent with the NCP" issues on the damages side of the ledger. That section permits the issuance of a declaratory judgment on liability for future response costs under CERCLA. *See* Part VII, *infra.* Presumably, at the time such a declaratory judgment issues, a court cannot know whether any particular response or remediation costs incurred in the future will be necessary and consistent with the NCP. Consequently, even after a declaratory judgment is entered, it may still be necessary in the future to determine whether particular costs incurred are necessary and consistent with the NCP.

In any event, it is mainly a matter of semantics whether the issues of "necessary" and "consistent with the NCP" arise as issues of damages or as issues of liability. Either way, what ultimately matters is that the Court and parties address, without omission, each of the elements of CERCLA liability and damages.

**20.** The costs incurred in *North Miami* were undertaken in accordance with a Consent Decree entered into by the City of North Miami and the EPA. Accordingly, there was a strong presumption that the plaintiff could establish *some* costs "necessary" and "consistent" with the NCP. This presumption also exists in the current case because the costs undertaken by plaintiff were investigatory in nature, and courts have generally recognized that investigatory costs are recoverable response costs consistent with the NCP. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989); *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 341–42 (D.Md. 1993).

propriate, both on- and off-site field investigatory efforts, and sampling." 40 C.F.R. § 300.410. Fully consistent with this, plaintiff undertook investigatory activities, including review of preliminary findings and on-site sampling, and completed detailed analyses of the results. Defendants present no evidence that plaintiff's investigations conflict with the types of investigations described in the NCP. Given this, there is no triable issue of fact concerning whether the response costs already incurred by plaintiff are consistent with the NCP and therefore plaintiff is entitled to summary judgment on this issue.

■ Next, the question whether plaintiff's studies were necessary must be examined. Defendants ARC and RS Company argue that plaintiff's studies were unnecessarily duplicative of the studies previously undertaken by Remcor for ARC, the results of which were shared with plaintiff. Plaintiff, in turn, contends that while parts of its studies may have been duplicative of Remcor's studies, they were nonetheless necessary because Remcor's studies often were not sufficiently thorough. This dispute creates a triable issue of fact and therefore summary judgment on this issue is inappropriate.

Further, even where costs are found to be necessary and consistent with the NCP, the issue remains whether the costs incurred were reasonable in the circumstances. Costs otherwise necessary and consistent with the NCP may nonetheless be unrecoverable if the steps taken were extravagant or otherwise unreasonably costly. The record reflects a triable issue of fact in this regard.

### VI.

■ ARC argues that the imposition of joint and several liability in this case is improper because the harm at the facility is discrete and easily divisible. Joint and several liability is generally appropriate in § 107 actions, and therefore defendants carry the burden of proving that apportionment is appropriate in this particular case. *See United States v. Rohm & Haas Co.,* 2 F.3d 1265, 1280 (3rd Cir.1993); *United States v. Monsanto Co.,* 858 F.2d 160, 171 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). To meet this burden, ARC must show either that there are "distinct harms" or that "there is a reasonable basis for determining the contribution of each cause to a single harm." *Monsanto,* 858 F.2d at 172 (citing Restatement (Second) of Torts § 433A (1965); *see also Chesapeake and Potomac Tel. v. Peck Iron & Metal,* 814 F.Supp. 1269, 1279 (E.D.Va.1992) ("the imposition of joint and several liability turns upon whether there is a reasonable basis for determining the contribution of each defendant to the harm at the Site").[21] ARC cannot demonstrate that there is a triable issue of fact concerning whether there are distinct harms here. Although it is reasonably clear that several sources, including the lime pit and the Hot Lab, contributed to the release of hazardous materials at the facility, there is no way to separate out these harms.

Similarly, ARC cannot demonstrate a triable issue concerning whether there is a reasonable basis for determining the contribution of each cause to a single harm. Again, it is clear that the releases that occurred over the years on the facility cannot be separated out in such a way that the harm resulting from each release can be separately calculated. Furthermore, ARC's argument here, as elsewhere, misconstrues CERCLA, which does not impose liability only on the party responsible for causing a release. As an operator of the facility at the time of disposal of hazardous materials, ARC is liable under CERCLA whether or not it directly caused the contamination involved.

### VII.

■ Under Section 113(g)(2) of CERCLA, a court "shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent

---

**21.** It is worth noting that defendants will have the opportunity to make arguments regarding the allocation of responsibility at the contribution phase of the proceedings. Whereas defendants have a strict burden to meet in seeking to avoid joint and several liability under CERCLA, the contribution stage enables defendants to argue, in equity, that their degree of responsibility among jointly liable parties should be reduced. *See* 42 U.S.C. § 9613(f)(1); note 7, *supra.*

action or actions to recover further response costs or damages." The award of a declaratory judgment pertains only to the fact of liability, not the amount, and therefore "the speculative nature of ... future costs is no bar to a present declaration of liability." *United States v. Fairchild Industries, Inc.*, 766 F.Supp. 405, 415 (D.Md.1991).

Because the defendants are jointly and severally liable under CERCLA for the contamination of the facility, declaratory judgment against all defendants for future remediation costs is proper. Of course, this declaration does not prevent defendants from challenging the actual costs incurred as unnecessary, inconsistent with the NCP, or unreasonable. *See Fairchild*, 766 F.Supp. at 415. Nor does it preclude defendants from seeking an equitable allocation of damages at the contribution phase of this proceeding. *See supra* note 7.

### VIII.

For the reasons set forth above, plaintiff's motion for partial summary judgment is granted against all defendants insofar as the Court finds (i) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (ii) that a release or threatened release of a hazardous substance has occurred on the site; (iii) that the release or threatened release has caused plaintiff to incur response costs; (iv) that each defendant falls within one of the categories of "liable parties" set forth in 42 U.S.C. § 9607(a); and (v) that plaintiff's response costs were consistent with the National Contingency Plan (NCP). Plaintiff's motion for declaratory judgment on the issue of liability is also granted. Plaintiff's motion for summary judgment is denied in all other respects. Left for trial are whether plaintiff's response costs already incurred were necessary and whether they were reasonable in the circumstances.

An appropriate order shall issue.