ELF ATOCHEM NORTH AMERICA

v.

UNITED STATES of America and Witco Corporation.

UNITED STATES of America

v.

WITCO CORPORATION

v.

ELF ATOCHEM NORTH AMERICA.

No. 92–CV–7458, 94–CV–0662.

United States District Court, E.D. Pennsylvania.

Dec. 7, 1995.

---

William J. Kennedy, Frederick G. Herold, Eli R. Brill, Dechert, Price & Rhoads, Philadelphia, PA, for Elf Atochem North America, Inc.

Brud Rossmann, Jonathan A. Marks, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, for U.S.

Michael R. Lazerwitz, Charles F. Lettow, Christopher G. Smith, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Witco Corporation.

## MEMORANDUM

JOYNER, District Judge.

Today we address two of eleven separate motions for summary judgment. Both motions seek a summary judgment that Elf Atochem, the plaintiff in 92–7458 and third party defendant in 94–0662, is the corporate successor to a now defunct corporation called Elko Chemical Works.[1] Movants are the United States, defendant in 92–7458 and plaintiff in 94–0662,[2] and Witco Corporation, defendant in both 92–7458 and 94–0662 and third party plaintiff in 94–0662. We presume familiarity with the general background of this case, which arises under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675 (1995) (CERCLA), and will provide additional facts only as they are required to explain and resolve the issues raised by the instant motions.

## STANDARD OF REVIEW

In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit" are material, and therefore preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2513–14. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-

---

1. Elf agrees that it is the corporate successor to the Pennsylvania Salt Manufacturing Company (Pennsalt), which purchased assets from Elko. Therefore, it is the relationship between Pennsalt and Elko that is at issue today.

2. The United States has two roles in this litigation. The first role is the traditional one of EPA prosecutor. The second role is as defendant for the Department of Defense's role as an owner of DDT manufacturing equipment.

moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

## DISCUSSION

In 1942, Elko Chemical Works purchased land in Clinton, New Jersey and began manufacturing chemicals at that site. The property, now known as the Myers Plant, is a CERCLA Superfund site and is the subject of this litigation. Elko used the Myers Plant exclusively to make chemicals for the United States such as saturant for cables on the Navy's submarines, arsenic trichloride and chlorinated benzene products. Notably, Elko also produced DDT, which was a highly valued commodity during World War II. During the War, the United States encouraged production of DDT and other essential chemicals by financing and leasing the necessary equipment to private companies. These companies were then contractually bound to supply all the product made with the leased equipment to the United States. To further protect its interest in an undiminished supply of DDT as well as the leased equipment, the United States incorporated a number of approval provisions into its contracts with the private companies. The contract between the United States and Elko, the Agreement of Lease, specified that the leased equipment could only be used at the Myers Plant and that United States approval was needed before the equipment could be transferred to another entity.

In 1944, Pennsalt purchased substantially all of Elko's assets at the Myers Plant as well as the land itself.[3] The main dispute between the parties is whether Pennsalt's purchase of these assets constituted a continuation of Elko's business such that Pennsalt

(and therefore Elf) is liable for Elko's environmental obligations, or whether the sale was simply a sale of assets such that the normal rules of corporations governs and Pennsalt is not liable. ·

## I.   Successor Liability under the Continuity of Enterprise Test

■ As a general principle, an asset purchaser is not liable for the obligations of the asset seller. There are four traditional exceptions to this rule that make a purchaser a successor, and therefore liable.

(1) The purchaser expressly or impliedly agrees to assume the seller's obligations;

(2) the transaction amounts to a consolidation or de facto merger;

(3) the purchaser is a mere continuation of the seller; or

(4) the transaction is fraudulent to avoid obligations.

*Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261 (E.D.Pa.1994).

■ Although CERCLA is silent on the topic, the Third and other Circuits have determined that successor companies can be held accountable for the CERCLA liabilities that their predecessors incurred. *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 92 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). To date, however, the Third Circuit has only encountered one kind of business reorganization in the CERCLA context. In *Smith Land,* the Court ruled that a statutory merger would give rise to successor liability, but expressly did not address the many other types of reorganizations that might also give rise to successor liability. *Id.* at 91.

Today's motions ask whether a purchase of assets creates successor liability. The parties agree that Pennsalt is not liable for

---

**3.** Much of the parties' disputes concern the status of the Myers Plant under Elko. Movants contend that it was a self-operating, independent division of Elko known as the Clinton Division. Elf, in contrast, maintains that the Myers Plant was one portion of a unified whole. It contends that the only time the name "Clinton Division" was used was on a form of letterhead used for sales solicitations. This dispute is relevant to the question whether Elko sold all or substantially all

of its assets. If Elf's position is correct, Elko did not sell all its assets because Elko retained a separate factory and headquarter office. If Movants are correct, then they can argue that Elko sold all or substantially all of the assets of a unique division of Elko. As discussed more fully below, we do not reach this preliminary question because we find that even accepting Movants' theory of the law, they still have not made the requisite summary judgment showing.

Elko's obligations under the above listed traditional exceptions to the non-liability rule. Therefore, Movants encourage this Court to apply an expanded version of the 'mere continuity,' exception. This expanded version is the "continuity of enterprise" or "substantial continuity" test. Movants contend that Pennsalt continued Elko's enterprise and as such, is its successor and is liable for its environmental transgressions.

The first case to apply the continuity of enterprise expansion in the CERCLA context was *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir.1992). There, a family-owned business repaired and rebuilt electrical transformers and as a result contaminated the business site with PCBs. Shortly after the EPA ordered the business to repair the environmental damage, the business ceased operations and sold its assets to two companies controlled by the sons of the family. Although this transaction had been found to be fraudulent by a state court, under traditional successor liability tests the sons' companies were not considered corporate successors of the family company, and therefore the sons, the only ones with assets, were not liable for the family company's CERCLA obligations.

The Fourth Circuit found that it would do injury to CERCLA's remedial objectives if it strictly abided by the traditional successor liability rules. Therefore, it affirmed the District Court's decision to expand the 'mere continuation' exception to include the continuity of enterprise test. *Id.* at 838. Applying that test to the facts of the case, the Fourth Circuit found sufficient indicia of successorship such as continuity of employees, assets and products. Significantly, the sons' businesses held themselves out as continuations of the family business and informed debt-holders that they were now creditors of the sons' businesses. *Id.* at 841. Given all this, the Court held that "the record as a whole leaves the unmistakable impression that the transfer of the [family business] to [the sons' businesses] was part of an effort to continue the business in all material respects yet avoid the environmental liability." *Id.* Accordingly, the Court found that the sons succeeded to the CERCLA liability.

Adoption of the continuity of enterprise expansion has been mixed. At least one court has characterized the test as the minority rule. *Sylvester Bros. Dev. Co. v. Burlington N.R.R.*, 772 F.Supp. 443, 449 (E.D.Mo. 1991). That court, like others, postponed adopting or rejecting the expansion, simply holding that its facts did not call for extension of the traditional exceptions. *Id.; see also Louisiana–Pac. Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1265–66 (9th Cir.1990). Still other courts, including this district through Chief Judge Cahn, have added certain scienter-type requirements as a prerequisite to a finding of successor liability. *United States v. Atlas Minerals & Chems., Inc.*, 824 F.Supp. 46, 51 (E.D.Pa.1993) (knowledge of potential environmental liability a prerequisite to successor liability under CERCLA). In contrast, several other courts, including Judge Giles of this District, have wholly adopted the continuity of enterprise expansion with no prerequisites. *Atlantic Richfield*, 847 F.Supp. at 1287 (rejecting *Atlas*'s additional requirement and fully adopting expansion).

Elf insists that Movants have not shown that they are entitled to summary judgment. At a minimum, Elf declares, we will find a genuine issue of fact as to whether Pennsalt continued Elko's enterprise. However, Elf maintains that this Court should not reach this point because of its belief that the Third Circuit would reject the continuity of enterprise expansion in the CERCLA context. Finally, Elf contends that a number of preliminary matters, such as those discussed in *Atlas*, bar us from even reaching the continuity of enterprise test.

Whether one corporation is a substantial continuation of another is a legal question. *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 489 n. 13 (8th Cir. 1992); *Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 399–400 (E.D.Va.1994). Accordingly, the question we answer today is whether the facts presented, if undisputed, fit the legal standard of a substantially continued enterprise. After examining the evidence presented and studying the law on the subject, we determine, as explained below, that the un-

disputed facts material to this issue demonstrate that Pennsalt was not the corporate successor to Elko, even using the continuity of enterprise expansion. Although the parties present us with many disputed facts, we find that none of the disputes are material to a final resolution of the corporate successor issue. This is because none of the disputed issues would affect a ruling that Pennsalt is not Elko's corporate successor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Because of this finding, many of Elf's objections concerning application of the test become moot. Accordingly, we will not consider them.

### 1. Retention of the Same Personnel and Production Facilities

The following facts are uncontested. Pennsalt retained Elko's entire Myers Plant manual laborer staff after the purchase. Pennsalt retained Elko's two top supervisors from the Myers Plant as consultants for one year although they remained Elko employees.[4] In addition, Pennsalt brought at least six full-time supervisors to the Myers Plant as well as several part-time supervisors. Finally, Pennsalt purchased almost all or all of the production facilities at the Myers Plant as well as the land itself. The parties dispute whether certain pieces of equipment unrelated to DDT production were removed to Elko's other facility, but all agree that at least all of the DDT equipment remained at the Myers Plant.

Movants contend that these facts demonstrate continuity of enterprise. They rely on continuity of the manual laborers and the two top Elko supervisors to support this contention. Movants allege that the Elko supervisors were essential to the DDT production process because they were the only ones at the Myers Plant who knew how to manufacture DDT.

Elf argues that there was no continuity of enterprise, demonstrated in part by its assertion that Pennsalt did not purchase Elko equipment or processes for several activities Elko had previously undertaken at the Myers Plant, such as Navy Cable Saturant or arsenic trichloride manufacturing. Further, it contends that many Pennsalt employees were familiar with DDT manufacturing and so the Elko supervisors' experience was not essential to Pennsalt's success. Finally, Elf claims that the manual staff remained with Pennsalt simply because there was a wartime labor shortage and because the plant was in an isolated area.

In *Atlantic Richfield Co.,* 847 F.Supp. at 1290, our court found that the "retention" factors were met when the entire staff of the seller, including its management, was retained by the new owner. In fact, the former owner continued to run the business as in the past with only a few minor restrictions on his power. *Id.* at 1290; *cf. Mexico Feed,* 980 F.2d at 489 (no continuity in part because no overlap of management or ownership).

■ The undisputed facts are that Pennsalt retained all of Elko's manual workers, none of its supervisors except as consultants and at least most of the production facilities. In addition, Pennsalt brought in several of its own managers. Movants read the test too narrowly when they assert that the only relevant factor here is whether old employees were retained, not whether new employees were added. Rather, the relevant consideration is whether the general makeup of the plant's employees was so similar before and after the purchase that it could fairly be said that it was the same "in all material respects." *Carolina Transformer,* 978 F.2d at 841. If the answer is yes, then a successor finding could legitimately be made.

■ We find that, as in *Mexico Feed,* the material "retention" facts simply show "good shopping" by Pennsalt, so that the plant was already well-staffed with able employees that there was no need to replace. 980 F.2d at 490.

### 2. Production of the Same Product

It is uncontested that Elko produced DDT at the Myers Plant before the sale and that Pennsalt produced DDT at the Myers Plant

---

4. Lee Kolker, the founder and President of Elko was also retained as a consultant but there is no evidence that his services were actually used.

Rather, he continued chemical manufacturing for his own benefit.

after the sale. Although Elko had produced other products at the Myers Plant, it had ceased those activities by the time of the sale. There is a dispute between the parties whether the method that Elko used to make DDT was an unusual or standard method. This dispute is immaterial, however, because it is uncontested that the Elko method was the method that Pennsalt adopted when it began manufacturing. Further, the United States required all DDT made for it to meet precise specifications so that the DDT made by the two companies was, of necessity, the same.

### 3. Continuity of Assets and General Business Operations

As mentioned above, it is uncontested that the DDT manufacturing process was not materially changed after the Pennsalt purchase and the equipment was largely the same.[5] It is also uncontested that the Assignment of the Agreement of Lease between Elko, the United States and Pennsalt directed Pennsalt to "operate the facilities" at the Myers Plant. Further, it is uncontested that Elko's only DDT customer, the United States, became Pennsalt's only DDT customer. There is no evidence as to the Myers Plant's general business operations before or after the sale.

Movants interpret these facts as supporting a substantially continued enterprise. They allege that the Assignment of Lease indicates Pennsalt's intention to purchase all the assets of the Myers Plant from Elko and to continue the Elko enterprise. In addition, Movants characterize the customer continuity as a continuity of Elko's goodwill with the United States.

Elf contests Movants' interpretation and asserts that the facts do not support continuity. It argues, moreover, that Elko had no goodwill with the government to inherit. It presents evidence that the United States questioned Elko's ability to meet its DDT production commitments and welcomed a

Pennsalt purchase. It also presents evidence that the United States advised Pennsalt to completely "divorce" its operations from Elko's if it did purchase the Myers Plant.

■ In *Atlantic Richfield*, we found indicia of substantial continuity when there was a memo in evidence sent from the selling company to the EPA asserting that "the *only* change that occurred [as a result of the sale] was that of legal ownership." 847 F.Supp. at 1291. Here, the assets at the Myers Plant did continue from Elko to Pennsalt in the sense that the same product was made by the same method in the same equipment and sold to the same customer. However, Pennsalt's promise to the United States to operate Elko's facilities does not prove an intent to continue the Elko enterprise, but rather demonstrates the United States' concern about an undiminished supply of DDT.

### 4. Retention of the Same Name and Whether the Successor Holds Itself out as the Continuation of the Previous Enterprise

It is uncontested that Pennsalt did not retain Elko's name. In fact, Elko retained the right to use its name and did so for between one to six months before it began using the name Kolker Chemical Works. It is undisputed that Elko dissolved approximately six months after the purchase and Kolker was formally incorporated about one year later. Further, Lee Kolker, Elko's founder and President, signed a non-compete clause that he would not give his DDT production methods to any other entity. Significant, however, is that Kolker was permitted to produce DDT himself, and in fact, did so.

It is also uncontested that the Assignment of Lease stated that "all acts heretofore done or caused to be done by [Elko] under the provisions of said Agreement of Lease shall be considered as having been done or caused to be done by or for the account of [Penn-

---

5. There is a dispute as to the amount of change. Movants contend that the process was identical with only immaterial additions to the equipment, whereas Elf contends that the process did change and that the equipment additions were material improvements. It is apparent though, that the basic functions and equipment remained unchanged. The changes that were made were refinements to the existing system and as such do not amount to material changes to the system or equipment.

salt]." Movants contend that these facts, especially the Assignment of Lease and the prompt Elko dissolution, demonstrate a holding out of successorship.

Elf argues, however, that Pennsalt never held itself out as Elko's successor, but that Elko continued to exist as a separate entity. Elf points to the uncontested facts that Elko's creditors did not turn to Pennsalt for recovery of debts, but remained Elko's creditors. For example, shortly after the purchase, Elko, as Elko, paid off a large debt to a materials supplier. Elf also proffers a letter that Pennsalt sent to Lee Kolker, of Elko Chemical Works, several months after the purchase. This letter goes to show Pennsalt's belief that Elko had survived the purchase as a separate entity. Finally, Elf points to uncontested evidence that Lee Kolker continued to produce DDT after the purchase and became one of the largest producers of DDT in the world.

Further, to explain the contract between Pennsalt and the United States, Elf points to the Agreement of Lease, which required the United States' permission before Elko could transfer its assets. Elf also points out that the Assignment of Lease only transferred Elko's obligations to Pennsalt with respect to use of the leased equipment and only gave rights against Pennsalt to the United States.

■ This court and others have frequently found the holding out element met when a purchaser retains the selling company's name and displays it on trucks, invoices and the like for at least a time to maintain customer continuity. *See Atlantic Richfield*, 847 F.Supp. at 1291. Other strong indicators of continuity are the information given to creditors or incorporation of the seller's age into slogans like, "serving our customers since 1949." *Id.* (continuity found when seller's creditors instructed that purchaser would be liable for debts); *Northwestern Mut.*, 847 F.Supp. at 400 (purchaser held self out as successor when letterhead proclaimed "leadership since 1949," date of seller's incorporation). In *Kleen Laundry & Dry Cleaning Servs. Inc. v. Total Waste Mgmt.*, 867 F.Supp. 1136, 1142 (D.N.H.1994), continuity was found when the asset purchaser also required the seller to execute a non-compete

clause prohibiting any competition from the former owner whatsoever, inherited the seller's customers and the seller wound down immediately after the purchase. These facts indicated the purchaser's intent to buy the entire business and not just its material assets. *Id.*

Here, the uncontested facts indicate that Pennsalt did not hold itself out as Elko's successor. Elko retained its name and continued its business, including manufacturing DDT. Pennsalt never used Elko's name, nor assumed any of Elko's obligations. The Assignment of Lease and Lee Kolker's partial non-compete clause are insufficient to demonstrate that Pennsalt held itself out as Elko's successor.

### 5. Summation

■ Before evaluating the above factors, we recall that the policy behind applying the more flexible continuity of enterprise expansion to the traditional exceptions to successor liability is to preclude "[CERCLA-]responsible parties from using corporate formalities to escape liability." *Atlas*, 824 F.Supp. at 49. The question cannot be simply whether a particular business was continued, but whether a particular business *enterprise* was continued by an asset purchaser.

If mere purchase and subsequent use of assets always gave rise to successor liability, no company could ever purchase another company's machines and plant, retain the people who were already trained to use those machines, manufacture the product the machines were designed to manufacture and sell to that product's market without becoming liable for all the obligations of the selling company. It is apparent therefore that what makes an asset purchaser a successor is something more than simply continuing a manufacturing process. The factors considered above are that 'something more.'

■ Accordingly, successor liability has generally only been found when there are "substantial ties" between purchaser and seller such as "a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same" or when "the actual managers of a corporation

took over its ownership with full knowledge of its past practices." *Mexico Feed*, 980 F.2d at 489–90. This is in contrast to arm's-length transactions between competitors. When a purchaser has no knowledge of potential CERCLA liability, successor liability is rarely found. *Atlas*, 824 F.Supp. at 51. In *Hunt's Generator Committee v. Babcock & Wilcox Co.*, 863 F.Supp. 879, 884 (E.D.Wis. 1994), the Court found no successor liability when "the new owner was a larger, preexisting corporation, the buyout was an arm's-length transaction, the new owner had been a competitor of the potentially liable corporation, and '[i]n addition, ... [the new owner] had no actual notice.'" *Id.* (citation omitted).

Given the above, we turn now to our facts. We find that the facts material to this issue are uncontested. As was seen, the transaction between Elko and Pennsalt was an arms' length transaction between competitors. The undisputed facts are that Pennsalt, a larger pre-existing company, purchased an entire manufacturing plant from Elko and then used that plant to manufacture the product the plant was set up to produce. Pennsalt brought in its own supervisors and absorbed Elko's assets into its own structure although it hired two Elko supervisors as consultants for one year. Pennsalt never held itself out as a continuation of Elko, and indeed, Elko continued its existence as Elko for a time after the sale. Moreover, Elko, as Kolker Chemicals, remained a competitor of Pennsalt's, eventually becoming a world leader in DDT production. These facts are analogous to the facts in *Hunt's Generator*, 863 F.Supp. at 883 and *Mexico Feed*, 980 F.2d at 489, where no successor liability was found.

■ Factors in favor of finding successor liability are that much of Elko's labor and equipment and Elko's only DDT customer were retained by Pennsalt. As was noted above, this alone cannot be enough to saddle an asset purchaser with a seller's liabilities. We find that as a matter of law, these facts are insufficient to establish a continuity of enterprise, especially given the special status of DDT at the time of the purchase. For these reasons, we find that Movants have failed to establish that Pennsalt was the cor-

porate successor to Elko. Accordingly, we deny summary judgment.

## II. Successor Liability under the New Jersey Spill Act

Witco also argues that Elf, through Pennsalt, is Elko's successor under New Jersey law pursuant to the New Jersey Spill Act. N.J.Stat.Ann. §§ 58:10–23.11—58:10–23.24 (West 1992). Witco asserts this New Jersey statute because Elf has sued Witco under it and because the Myers Plant is located in New Jersey. Witco's argument is based on the same evidence provided above, namely that Pennsalt continued Elko's product line and business enterprise.

Above, we ruled that Witco had failed to demonstrate that Pennsalt was the corporate successor to Elko under either the traditional exceptions to the non-liability rule or under the continuity of business expansion of the exceptions. Here, Witco has presented only the same evidence and arguments and for the reasons given above, we find them unavailing as to the New Jersey Spill Act. Accordingly, we deny summary judgment on this point.

## III. Successor Liability under Equitable Principles

Finally, the United States asks this Court to rule that Elko's entire share of liability should be allocated to Elf as a matter of equity. The evidence it proffers in support of this position is that Pennsalt was Elko's corporate successor, that Pennsalt was aware of Elko's waste disposal problems and that Pennsalt reaped great financial rewards as a result of its purchase of Elko's business. These factors allegedly make it inequitable for Elf to avoid Elko's obligations. In addition, the United States proposes that it is more equitable to allocate Elko's share to Elf than to make it an 'orphan' share, paid by the taxpayer.

Elf objects to each of the United States' proposed undisputed facts and we find that there are genuine issues of material fact. Moreover, at this time we find that allocation matters are premature partially because liability determinations are still being made. For this reason, we deny this portion of the

United States' Motion for summary judgment.

An appropriate Order follows.

## ORDER

AND NOW, this 7th day of December, 1995, upon consideration of the Motion by Witco Corporation for a Summary Judgment that Elf Atochem North America, Inc. is the Corporate Successor to the Government Contracts Business of the Elko Chemical Works, Inc. (doc. no. 168) and upon consideration of the United States' Motion for Summary Judgment that Elf Atochem is the Successor to Elko Chemical Works, Inc. (doc. no. 172) and responses thereto, the Motions are hereby DENIED in accordance with the attached Memorandum.