CITY OF TOLEDO, Plaintiff,

v.

BEAZER MATERIALS AND SERVICES, INC., Successor-in-Interest to Koppers Company, Inc.; Toledo Coke Corporation; The Interlake Corporation, Successor-in-Interest to Interlake, Inc.; The Interlake Companies, Inc., Successor-in-Interest to Interlake, Inc. and Acme Steel Company, Successor-in-Interest to Interlake, Inc., Defendants.

No. 90–CV–7344.

United States District Court,
N.D. Ohio,
Western Division.

Jan. 22, 1996.

John D. Scouten, City of Toledo, Department of Law, Toledo, OH, Stephen P. Calardo, Kevin Bragg, D. David Altman, Altman & Calardo, Cincinnati, OH, for Plaintiff City of Toledo.

Kenneth R. Bruce, "Albee" Bates, Babst, Calland, Clements & Zomnir, Pittsburgh, PA, for Defendant Beazer East, Inc.

Paul W. Schroeder, Suzanne S. Greene, Jones, Day, Reavis & Pogue, Chicago, IL, for Defendants The Interlake Corporation & Acme Steel Company.

*PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DECLARATORY JUDGMENT ON CERCLA LIABILITY AS TO THE INTERLAKE DEFENDANTS MEMORANDUM AND ORDER*

WILLIAM K. THOMAS, Senior District Judge.

Plaintiff City of Toledo (the "City") moves this court pursuant to Rule 56 of the Federal Rules of Civil Procedure to enter summary judgment against the Interlake Companies, Inc., the Interlake Corporation, and Acme Steel Company (collectively "Interlake") on the issue of liability for the City's response costs under § 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") 42 U.S.C. § 9607(a), and to award the City response costs incurred in conducting environmental investigations. The City further moves this Court pursuant to 42 U.S.C. § 9613(g)(2) to enter declaratory judgment on liability against Interlake for future response costs which are necessary and consistent with the National Contingency Plan ("N.C.P.")

The Court for now lays aside the cross-motion of the Interlake defendants for summary judgment. This cross-motion will be considered in a separate Memorandum and Order.

## I.

As the legal basis of its motion for summary judgment for response costs for services rendered by MEC and OHM, plaintiff City cites CERCLA law set forth in *Stychno v. Ohio Edison Co.*, 806 F.Supp. 676 (N.D.Ohio 1992).

Courts have determined that recovery of expended costs of response on a claim brought pursuant to this subsection requires proof of at least four elements. These elements are:

1) That the defendant, at the time of disposal of any hazardous substance, owned or operated the facility at which the hazardous substances were disposed of, CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2),

2) There must have been a release or threatened release of hazardous substances from the site [footnote omitted], CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4); *See* CERCLA §§ 101(14), (22),

3) The release or threatened release must have caused plaintiff to incur response costs, CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4), and

4) The plaintiff's costs must be necessary costs of response consistent with the national contingency plan. CERCLA § 107(a)(4)(B); 42 U.S.C. § 9607(a)(4)(B).

*Stychno*, 806 F.Supp. at 679–680.

## II.  (A)

To satisfy the first element plaintiff City notes:

> In its sworn interrogatory, Interlake admitted that "Interlake . . . and/or its predecessors owned and operated the Toledo Coke Plant." [6]

[6] The Sixth Circuit Court of Appeals has held that "Congress included successor corporations within the description of entities that are potentially liable under CERCLA for clean-up costs." *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1245 (6th Cir.1991).

> Pl.['s] Mot. for Summ.J. at 6.

At no point in their brief do the three Interlake companies retract the above-quoted interrogatory admissions.  Moreover, in making supplemental responses to plaintiff's first set of interrogatories, Interlake stated as follows: "defendants, The Interlake Companies, Inc., The Interlake Corporation and Acme Steel Company (collectively, "Interlake"), for their response to plaintiff's first set of interrogatories. . . ."  Their collective response is consistent with their interrogatory answers.

> Notwithstanding, Interlake argues:

> Without citation to anything in the record, the City's Summary Judgment motion treats Acme Steel Company and the other two Interlake Defendants as though they were a single entity when, in fact, each is a distinct corporate entity, as Richard Doersch explained during the trial.

> Interlake's Resp. at 14.

However, the testimony of Richard Doersch, Interlake's corporate counsel, blurs the distinctions between these three corporate entities.  At the 1994 trial, the City, as part of its case, read the deposition testimony of Richard C. Doersch, corporate counsel of Interlake Corporation.  He delineated the history of the three Interlake defendants.  At the time of its 1978 asset sale of Toledo Coke Plant, the Seller was Interlake, Inc.  Mr. Doersch testified:

> In 1986 [May], there was a corporate reorganization.  Interlake, Inc. reorganized, and Interlake Corporation was formed. That's where I am working.

That's where I am now working, but what is the initial company, Interlake, Inc. became Acme Steel Company just by change of name, and I did work for Interlake, Inc.

And effective as of that day in May of '86, I ceased to work for Interlake, Inc., and I worked for the Interlake Corporation, but I have never worked for Acme Steel since it became—you know—took on that name since the reorganization in '86.

. . . .

Q.  Which companies, if any, have assumed the liabilities of Interlake, Inc. and any of its predecessors[?]

. . . .

A.  Interlake Corporation assumed responsibilities for various things, and the Toledo plant may very well be one of them.

. . . .

Q.  Has Interlake Companies, Inc. also assumed liabilities associated with the shutdown and closure of the Toledo Coke facility located on Front Street in Toledo, Ohio?

A.  Now that I hear the second question, I am not sure whether it is the Interlake Companies or the Interlake Corporation that has assumed those liabilities.  I am not entirely clear in my mind which one of them has assumed those.  It should be Interlake Companies or Interlake Corporation.  I don't know what I said, but that's what I should have said.

> Tr. at 2627, 2629–2631.

On the total record, it is evident and it is found that Interlake, Inc. owned and operated the Toledo Coke Plant at the time that "the Interlake defendants produced and transported presently existing benzene contamination to the impoundment pit (now Right-of-Way) and the adjacent "hot spots." (Memorandum and Order of August 29, 1995 at 17.)  By change of name, Interlake, Inc. became Acme Steel, thus making Acme Steel the successor in interest of Interlake, Inc. Thus, Acme Steel is deemed to be responsible as the corporate successor to Interlake, Inc., owner and operator of the impoundment pit (now Right-of-Way) and the adjacent "hot spots", at the time that Interlake disposed of

the benzene there. *See Anspec Co. v. Johnson Controls, Inc., supra* at 1245. But Doersch's testimony also establishes that either or both of the new corporations, Interlake Corporation or the Interlake Companies, Inc. (both apparently incorporated in 1986) may also be obligated as successors for the liabilities of Interlake, Inc. (now Acme Steel). Based on Doersch's testimony, and Interlake's previously quoted interrogatory admission, and in the absence of clarifying evidence on the matter, it is determined, that all three Interlake defendants should be treated as owners and operators of Toledo Coke Plant at the time the hazardous substances were disposed of at its Impoundment Pit. Thus, the first element of *Stychno* is satisfied.

At this point it is relevant to take up Interlake's "first issue:"

[T]he City has improperly expanded its CERCLA claim beyond the limits established by the Court following last year's trial.

Interlake's Resp. at 1.

During the teleconference of July 24, 1995, this colloquy occurred:

MR. SCHROEDER: With respect specifically to what, if any, further ground the Court has to plow on CERCLA, all I can say is that the City's Summary Judgment Motion, specifically at page 9, says that The entire site—and I am quoting now—"The entire site including but not limited to the City's right-of-way property is a facility under CERCLA."

So their current litigation stance is that the entire site is at issue. If Mr. Calardo is saying that he is now willing to amend the summary judgment to specifically put in issue only the right-of-way and that area adjacent thereto, then I believe that would have an [e]ffect on what is and is not important with respect to our contribution claims against our co-defendants because I do not disagree with the Court that, as to the right-of-way, the question of what was Toledo Coke's contribution and Beazer's contribution to the right-of-way, that was an issue that was litigated.

But it was never litigated what contribution, if any, Koppers and others have made

to other areas of the entire site. But I welcome Mr. Calardo's amendatory language, and I would like to see it on this motion because it certainly would make our response a lot easier.

MR. CALARDO: Your Honor, I can say with respect to the motion, the relief we are seeking is directed to the right-of-way, that area immediately adjacent to the right-of-way and need to cut off that right-of-way from future contamination. Our definition of the site will not change.

Overall, that case involves the entire site and what is relevant to the case, the disposal that occurred at the site, but we are not seeking as part of the Summary Judgment Motion cleanup of the entire site.

MR. SCHROEDER: They are seeking liability as to the entire site. If Mr. Calardo says he is not—you know, there is a difference—Mr. Calardo talks about response cost, and that is an issue that will have to be addressed.

But there is also the question of Interlake's liability, and a finding of liability with regard to the entire site is a lot different from a finding of liability as to the right-of-way, [at least] from our point of view—

THE COURT: Let me make this suggestion: Is it possible, Mr. Calardo, that you could, without—I don't know how you do it—but is it possible that some way you could cut your cloth in your Motion for Summary Judgment to the right-of-way and the adjacent territory and reserve any way you want to the City's belief that, indeed, the whole site is involved, even though you are not asking for summary judgment on that entire site?

MR. CALARDO: I think we can go ahead and submit a very brief amendment to the motion, and pursuant to this phone call, to go ahead and make that point clear. But at the same time not narrowing the focus of that so much, but in the future, we base all sorts of objections on what is and what isn't relevant. I think we can put that together. I would want to consult with the City first on that, but I think that's something we can put together.

Teleconference of July 24, 1995 Tr. at 33–35.

Thereafter, Mr. Calardo filed such an amendment to the City's Summary Judgment motion. A little over a month later, on August 29, 1995 this court filed its "Interlake's Motion for Clarification Memorandum and Order." In a part having direct bearing here, this court there determined:

Applying these *Nurad* holdings it becomes evident, and it is found, that Beazer (through Koppers) and Toledo Coke are potentially responsible parties. At the time Koppers owned the entire coke plant site (including the Right-of-Way portion Toledo Coke sold to the City in 1988) the Right-of-Way portion was benzene contaminated. This is so because the court found in the Memorandum and Order of June 14, 1995 at page 47 that the Interlake defendants produced and transported presently existing benzene contamination to the Right-of-Way and the adjacent "hot spots." "Disposal" defined in 42 U.S.C. 9601(29) includes "leaking" of "hazardous waste." This term embraces the present benzene contamination of the Right-of-Way and adjacent "hot spots" but this same contamination of this "facility" earlier existed during Koppers' ownership, add during Toledo Coke's ownership of the "facility."

Mem. and Order of August 29, 1995 at 16, 17.

Applying these determinations of August 29, 1995, this court now concludes that the second *Stychno* element is presently not in dispute. There has been "a release or threatened release of hazardous substances from the site [i.e., the facility]." [1]

While the trial evidence has not shown that a release of benzene from the Right-of-Way into the air has yet occurred, the following findings of June 14, 1995 show that this is likely to occur:

Nevertheless, does such a human health risk represent "uncertainties in the risk assessment results" that, as seen in the B–122 quote above, would warrant "a risk manager" to "decide that a lower level of risk to human health is unacceptable and that remedial action is warranted?" It is concluded that the risk to human health from the benzene that will volatize in the right-of-way during highway excavation or utility repair or maintenance would warrant a risk manager to decide that "remedial action is warranted," under CERCLA. This conclusion is directly supported by Dr. Robison's opinion testimony, quoted, *supra*, at 108–110.

Mem. and Order of June 14, 1995 at 177.

Further, in its June 14, 1995 Memorandum and Order this court held:

The May, 1988 MEC findings regarding the right-of-way, the OHM August, 1989 findings, and OHM's October, 1993 findings with reference to monitoring wells 130 and 135 on the right-of-way, directly corroborate Dr. Robison's opinion that "benzene has definitely contaminated the soil and ground water" on the "City's right-of-way property."

*Id.* at 89–90.

These findings concur with CERCLA law that:

the exact concentration levels of hazardous substance are legally irrelevant, since the third circuit has held that liability for response costs under CERCLA does not depend on the presence of some minimum threshold level of hazardous substance. *Alcan,* 964 F.2d [252] at 259–61 [ (1992) ].

*Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261, 1274 (E.D.Pa., March 7, 1994).

1. The site, thus geographically limited to the Right-of-Way and adjacent hot spots, is found to be a "facility." A facility includes the following: (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehi-

cle, rolling stock, or aircraft, or (B) *any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located;* but does not include any consumer product in consumer use or any vessel (emphasis added). 42 U.S.C. § 9601(9).

## II. (B)(1)

As the third element, the City of Toledo needs to show under *Stychno:*

> The release or threatened release must have caused plaintiff to incur response costs.

*Stychno, supra* at 680.

*U.S. v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1500 (6th Cir.1989) cites 42 U.S.C. § 9607(a) as the source of "response actions" and "response costs." The Sixth Circuit holds:

> Essentially, Congress has authorized the Government to utilize Superfund money to take direct response actions that are consistent with the NCP [8] and to recover *all* response costs from all persons responsible for the release of a hazardous substance. 42 U.S.C. § 9607(a). The recovered funds are used to replenish the Superfund [emphasis in original].

---

[8] The National Contingency Plan is described at 42 U.S.C. § 9605 and is set forth at 40 C.F.R. Part 300, *et. seq....*

The *R.W. Meyer* opinion continues quoting the parties identified in Section 9607(a)(1)(2)(3) and (4), each "shall be liable for:"

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
>
> ....
>
> [Paragraphs (C) and (D) quoted in *R.W. Meyer, Inc.* are not presently essential and are here omitted.]

*Id.* at 1501.

*R.W. Meyer, Inc.* then states:

> As noted, section 9607(a) authorizes the government to recover all costs of removal or remedial response actions.

> *Id.*

Subsequently, the Court quoted the statutory definitions of "remove" or "removal," and "remedy" or "remedial action," and "respond or response," found in 42 U.S.C. § 9601(23),

(24) and (25). Relevant here, "remove" or "removal" means "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." (*Id.* at 1501.)

*R.W. Meyer, Inc.* dealt with the government's recovery of "*all* response costs from all persons responsible for the release of a hazardous substance" [Emphasis in original]. Under CERCLA § 9601(21), the city of Toledo, a "municipality" is a covered person who also may bring an action against "any other person" liable under § 9607(a)(4)(B) for "any other necessary costs of response incurred ... consistent with the national contingency plan." It is this language that gives rise to the term "response costs," a term not defined in CERCLA.

The question, now reached, is whether in order to obtain a judgment for its environmental investigation and monitoring costs, the City of Toledo must show that its "necessary costs of response" were "incurred ... consistent with the national contingency plan."

## II. (B)(2)

Interlake argues:

> The City bears the burden of demonstrating, as a matter of fact, that it incurred "*necessary* costs of response" that are consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B) (emphasis added); *Donahey v. Bogle,* 987 F.2d 1250, 1255 (6th Cir.1993) *cert. denied,* [—— U.S. ——] 114 S.Ct. 636, [126 L.Ed.2d 594] (1993) and *cert. granted and judgment vacated on other grounds,* [—— U.S. ——] 114 S.Ct. 2668 [129 L.Ed.2d 805] (1994);

Interlake's Resp. at 15.

Plaintiff City insists that "The City's costs associated with MEC's and OHM's monitoring, assessment and evaluation of the hazardous substances at the Facility were 'necessary' costs of response." Citing its holding in *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th Cir.1992), the 10th Circuit in *U.S. v. Hardage,* 982 F.2d 1436, 1448 (10th Cir.1992) "noted that CERCLA fails to define 'necessary costs of response.' " It reaffirmed its conclusion in *Daigle:*

that "necessary costs of response" must be necessary to the containment and cleanup of hazardous releases. *Id.* at 1535–37.

> *Hardage*, 982 F.2d at 1448.

■ In confirming the presence of benzene contamination in the Right-of-Way and adjacent "hot spots," the MEC and OHM findings undisputedly show that their services were necessary to the "containment and cleanup" of the benzene contamination. Those findings are now quoted from this court's June 14, 1995 Memorandum and Order:

> In July 1988 Midwest Environmental Consultants [MEC] prepared and issued its "Environmental Assessment of the Front Street Toledo Coke N & W R.R. Right-of-Way," Exhibit P–49. This was prepared for the City of Toledo Engineering & Construction Division.
>
> *Id.* at 41.

Further at length in the June 14th, 1995 Memorandum and Order, this court made findings as to OHM:

> OHM Remediation Services Corp. of Pittsburgh, Pennsylvania, a subsidiary of OHM Corporation, was engaged by the City of Toledo to perform the additional investigation of the right-of-way site recommended by MEC. OHM obtained soil and ground water samples in August, 1989. On November 16, 1990 OHM issued its "Preliminary Report of Toledo Coke Phase I Site Assessment Work for the Phase II Front Street Improvement Project," Exhibit P–50.... In its General Overview of site conditions, the OHM Report states:
>
> > The discussion presented below describes general site conditions for these two areas of the project. The project has been divided into two areas to simplify the discussion and understanding of site conditions. The two areas are the southwest area, Toledo Coke property also commonly referred to as the "benzene area" and the southeast area which is in close proximity to the Toledo Coke facility.
> >
> > P–50 at 4–1.
>
> The findings of the OHM 1989 Phase I Site Inspection and Preliminary Assessment are digested in OHM's December 15, 1993 Report on Phase II Investigation (P–53).

Having compared this digest (pages 2–2 and 2–3 of P–53) with Appendix A: Boring and Test Pit Classification Logs in OHM's Preliminary Report (P–50) and confirmed the readings, the court will copy from the 1993 digest.

> In its 1989 site assessment, OHM drilled 4 soil borings and excavated 17 test pits. Test pit TP–10L, located between the Toledo Coke property line and the impoundment area, had 107 mg/kg of benzene in soil at a depth of 5.75 feet. Ground water at a depth of 7.75 feet contained 102 mg/L of benzene. Test pit VTP–1 (volatilization test pit), at the southwest corner of the impoundment itself, had benzene at 2.11 mg/kg at 1 to 3 feet, 20.1 mg/kg at 5 to 7 feet, and 54.3 mg/kg at 7 to 8 feet. The third test pit, VTP–2, was between the adjacent dike and the northeast corner of the impoundment itself. At this location, benzene concentrations were 513 mg/kg at 1 to 3 feet, 2,420 mg/kg at 5 to 7 feet, and 1,470 mg/kg at 7 to 8 feet.
>
> Tests were also taken in 1989 outside the impoundment area but inside the Right-of-Way. The earlier MEC finding of 30 mg/kg of benzene in soil within the diked area was confirmed at OHM test pit TP–13L. Benzene at 25.1 mg/kg and phenols at 18.6 mg/kg were found at a depth of 5.33 feet. No benzene was detected in another test pit, TP–12L, located further to the southwest within the diked area. However, elevated concentrations of cadmium at 4.12 mg/kg, mercury at 0.58 mg/kg, lead at 48.8 mg/kg, and zinc at 338 mg/kg were found at a depth of 5.83 feet (P–53 at 2–2).
>
> *Id.* at 52–54.

Upon the basis of the foregoing findings of MEC and OHM, not challenged in the record with any contrary evidence by Interlake, this court finds that the services of MEC and OHM were "necessary." Thus, the costs of such services were "necessary response costs."

■ As seen, relying on *Donahey v. Bogle*, 987 F.2d 1250, Interlake also argues that the costs were not "consistent with the National Contingency Plan." Also relying on *Donahey*, at 1255, City of Toledo asserts:

The Sixth Circuit Court of Appeals has expressly held that *monitoring, assessment, and evaluation costs,* such as those incurred by the City for MEC's and OHM's soil and groundwater testing, *are recoverable without regard to the NCP* (footnote omitted). *Donahey,* 987 F.2d at 1255–56.... In *Donahey v. Bogle,* the Sixth Circuit Court of Appeals stated as follows:

> Although consistency with the NCP is a necessary element for recovery of remedial costs, it does not necessarily follow that consistency with the NCP is required for recovery of monitoring or investigative costs. In *Carlyle Piermont Corp. v. Federal Paper Board Co.,* 742 F.Supp. 814 (S.D.N.Y.1990), the Court held that *such costs are recoverable without regard to compliance with the NCP....* This court believes the *Carlyle Piermont* reasoning [on the instant issue] is sound, and we will remand for an award of Donahey's initial investigation costs. [Emphasis added by City]

Pl.['s] Mot. for Summ.J. at 16–17.

The Sixth Circuit adds "*See also Artesian Water Co. v. Government of New Castle County,* 851 F.2d 643 (3rd Cir.1988)." The Third Circuit in *Artesian Water* affirmed the District Court's holding that utility could recover "for costs incurred in monitoring and evaluating the impact of leachate on Llangollen Wellfield," *Artesian Water,* at 651.

In *Northwestern Mutual Life Insurance Company v. Atlantic Research Corporation,* 847 F.Supp. 389 (E.D.Va.1994), the court considered plaintiff's claim for investigatory costs "incurred in paying two qualified firms to conduct environmental studies of the facility." The Court held:

> Under CERCLA's expansive definition of "removal," it follows that a "response" includes environmental studies of a facility undertaken to "monitor, assess and evaluate" the release of hazardous substances. Thus, costs incurred for purposes of evaluation and investigation, such as the studies undertaken by plaintiff, qualify as "response costs" [citation omitted].

*Id.* at 396.

Applying the 6th Circuit *Donahey* ruling, as earlier quoted, this court concludes that the City of Toledo is entitled to recover damages for costs incurred in monitoring and evaluating the environmental condition of the Right-of-Way, subject to consideration of *Interlake*'s second objection:

> costs incurred to assist in litigation or primarily to support a litigation position are clearly not necessary to the containment and cleanup of hazardous substance releases, and thus are *not* necessary costs of response.

Interlake's Resp. at 17.

Mr. Calardo, City of Toledo counsel, explained the nature and purpose of MEC's monitoring and evaluating services:

> MR. CALARDO: At the time these documents were produced, MEC was a consultant retained by the City for performing work and in connection with potential litigation at that point.
>
> ....
>
> Now, Mr. Niece has not been named as an expert in this case.
>
> ....
>
> He had a character as an environmental consultant who was a litigation consultant....

Tr. at 343–344.

> MR. CALARDO: Well, your Honor, what I was going to say, number one, in terms of Mr. Niece testifying about those documents.... I don't know what's in them. He will be testifying about the report that he prepared, the data that is contained within that report, so, number one, that's what is testifying about.

Tr. at 349.

Bernard J. Leite, Director of the Department of Public Service for the City of Toledo, explains the City's engagement of Midwest Environmental Consultants (MEC):

> Q. Now, did the City of Toledo ever have occasion to hire an environmental contractor known as Midwest Environmental Consultants or MEC?
>
> A. Yes.

Q. And in what connection was MEC first hired by the City for the Front Street roadway expansion project?

A. To make an investigation in the portion of our Front Street project adjacent to the Chevron property.

Q. And why was that done?

A. Based upon, again, information that Mr. Moline had relative to the Chevron property. Th[ere] was concern that there may be contamination in the right-of-way that we would be constructing our roadway in, and the discussion lead to the understanding that we should undertake—we as a City—should undertake an investigation of that situation.

Tr. at 1478.[2]

In its "Report of Phase II Investigation and Removal Site Evaluation for the Phase II Front Street Improvement Project," Plaintiff's Exhibit 53, OHM Corporation stated in its Introduction:

This report presents findings of the Phase II Investigation and Removal Site Evaluation conducted by OHM Remediation Services Corp. (OHM), a wholly owned subsidiary of OHM Corporation, for the Phase II Front Street Improvement Project. Recommendations of this report are based on these results as well as those from OHM's Phase I site assessment and data developed by Midwest Environmental Consultants (MEC).

P–53 at 1–1.

Thus, MEC denominates its services as the "perform[ance] of an environmental assessment." Similarly, OHM designates its services as "OHM's Phase I site assessment" and "Phase II Investigation and Removal Site Evaluation." Thus identified, both MEC and OHM monitored and evaluated environmental conditions. But are the costs of the services disqualified from reimbursement because, according to Mr. Calardo, MEC and presumably OHM also, were "retained by the

City for performing work in connection with potential litigation," *supra* at 16.

Interlake cites *United States v. Hardage*, 750 F.Supp. at 1511–1519, and *Hardage*, 982 F.2d at 1448 stating that the district court "found that many of the costs were incurred to assist the HSC'S litigation position and to support the HSC's preferred remedy for the site, and thus were not 'necessary' or 'recoverable' as response costs." (Interlake's Resp. at 17.) In *Hardage*, the district court initially determined that the government, under CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), was entitled to summary judgment for its response costs against third party defendant Hardage Steering Committee (HSC). On a separate issue, HSC appealed the district court's denial of "certain HSC response costs based on the erroneous presumption that private parties may not recover litigation-related response costs." (*Hardage*, 982 F.2d at 1439.) The 10th Circuit Court of Appeals ruled:

The [district] court correctly determined that, under the language of CERCLA, private parties may recover "any other necessary cost of response incurred ... consistent with the [NCP]." CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). In the context of discussing what is a necessary response cost and how a response cost is incurred consistent with the NCP, the court addressed litigation-related costs. Finding that there is no express authority for the recovery of costs incurred to assist counsel in their defense of litigation, *Hardage*, 750 F.Supp. at 1511, the court went on to apply the "necessary and consistent with the NCP" standard. Although the court ultimately disallowed all HSC costs that it determined were litigation-related, there is nothing in the record or court's opinion to suggest that the court found these costs per se unrecoverable and therefore disregarded the "necessary and consistent with the NCP" standard. On the contrary, in its conclusions of law, the

2. In the report's "Executive Summary" MEC states:

Midwest Environmental Consultants, Inc. (MEC) was contracted to perform an environmental assessment on the proposed Front Street Right-of-Way including parcels owned

or previously owned by Toledo Coke Corporation, the Norfolk and Western Railway Company, Toledo Terminal Railway Company, Mr. Jones and Mr. Geraldo. . . .

P–49, vol. I.

court specifically stated that the various HSC costs "borne primarily to support the HSC's litigation position are not 'necessary costs of response . . . consistent with the [NCP].'"

*Hardage,* 982 F.2d at 1447.

The Court of Appeals thus does not read the district court's decision as holding that Section 9607(a)(4)(B), as a matter of law, prohibits a private party from recovering costs incurred to assist counsel in their defense of litigation. Rather,

the [district] court specifically stated that the various HSC costs "borne primarily to support the HSC's litigation position are not 'necessary costs of response . . . consistent with the [NCP].'"

*Id.*

If including assistance of litigation expense as a response cost for defense of a government action is not prohibited by Section 9607(a)(4)(A), then assistance of litigation expense in bringing an action to achieve CERCLA compliance, as here, may be recoverable as a response cost under Section 9607(a)(4)(B). Also, since in the instant case the City of Toledo is seeking response costs and is not defending against a government response cost claim, HSC's claim for the cost of litigation defense, in any event, renders *Hardage* distinguishable.

As for the 10th Circuit Court of Appeals upholding the district court's finding that HSC's assistance of litigation expense is not a "necessary cost of response consistent with the [NCP]," the 6th Circuit holding in *Donahey* controls. The "necessary cost of response consistent with the [NCP]" element does not apply when reimbursement of only the expense of monitoring and investigating environmental conditions is being sought as a response cost. The MEC, Bernard J. Leite and OHM quoted purposes of their services, *supra* at 16–18, bring the City's request for response costs within the control of the *Donahey* ruling.

■ As analysis, *infra,* of the requested response costs reflects, the costs do not include direct litigation expense, i.e., plaintiff's attorney fees. That MEC and OHM performed work "in connection with potential litigation, [Tr. at 343]" did not render the expense of these services unrecoverable as response costs. *HRW Systems, Inc. v. Washington Gas Light Company,* 823 F.Supp. 318 (D.Md.1993) holds:

### a. *Necessary Costs*

■ The substance of Washington Gas' first contention is that any site investigation conducted by the plaintiffs was not a necessary response cost because it was performed "to further [p]laintiffs' litigation interests." Washington Gas, Memorandum, at 22.

. . . .

It was necessary for the plaintiffs to determine the extent and nature of the pollution of the subject property. This they did by conducting an investigation. Whether this investigation was in the nature of a PA or an SI, to use the terminology of the NCP, is, for the Court's present purposes, irrelevant. The investigations conducted by the plaintiffs describe the release, describe the probable nature of the release, and make some recommendations for future action. HRW Memorandum, Exhibits A–1, A–5. Such an investigation is, therefore, clearly consistent with the NCP, and it falls under the rubric of "necessary costs."

The fact that the plaintiff can use the information gathered from the investigation, even to support a lawsuit, is, again, irrelevant to the issue before the Court. There is nothing in the NCP which contemplates that information gathered for one purpose cannot be used for another. In fact the statute clearly contemplates the use of information gathered as part of a "response" to be used for enforcement purposes. ("The terms 'respond' and 'response' . . . include enforcement activities related thereto." 42 U.S.C. § 9601(25)) (footnote omitted).

*HRW Systems,* 823 F.Supp. at 342–343.

Upon the foregoing analysis, this court rejects Interlake's defense based on *Hardage, supra.* Relying on *Donahey* and *HRW Systems, Inc.,* this court further finds presently

inapplicable Interlake's argument that "plaintiff has not proven that its alleged response costs are consistent with the NCP."

With reference to the activities of MEC and OHM, an affidavit of Public Service Director Bernard J. Leite, is filed along with the City's attached MEC and OHM invoices. These "pertain[ ] to the costs of the environmental investigations performed by OHM and Midwest Environmental Consultants relating to the Toledo Coke Site." (Leite affidavit at 2.)

On their face, the invoiced costs of MEC and OHM's environmental activities, at least as to those activities with reference to the Right-of-Way and the adjacent "hot spots," fall within the CERCLA definitions applicable to response costs as construed by the 6th Circuit in *Donahey v. Bogle,* 987 F.2d at 1255–56.

The Midwest Environmental Consultants' invoice for professional services up through July 30, 1988 apportions items totaling $66,-224.73 for the "Toledo Coke/N & W R.R. Environmental Assessment." How much of this total relates to the N & W R.R. property is not stated. If this amount involves any services on N & W R.R. property, a deduction needs to be made for services rendered thereon. For MEC professional services rendered July 30, 1988 through October 29, 1988, MEC invoiced and was paid $74,061.98. The final MEC invoice was $17,269.36. Paid by the City of Toledo, these invoices appear to be related to the Toledo Coke property, but the above uncertainty regarding services on the N & W R.R. property needs to be resolved.

As to OHM's services performed on Toledo Coke property (excluding the conveyed Right-of-Way), these services properly investigated the extent of benzene and other contamination. The purpose was to determine any contamination that might migrate onto the Right-of-Way. That the court has earlier found that only the "hot spots" offer such possibility of migration would not require limiting reimbursement for services performed on the Right-of-Way and the "hot spot" areas. Such hindsight reasoning is unacceptable. Hence, this court respectfully reject's Interlake's contention:

Additional discovery as to MEC and OHM is necessary, since the only costs that the City may recover are the necessary costs of response incurred consistent with the NCP at the impoundment pit.

Interlake's Resp. at 21.

OHM invoices, paid by the City of Toledo, include $51,070.55 for Environmental Services—Front Street Improvement. It is uncertain how much of this amount pertains only to Toledo Coke; $33,973.50 for "Sampling and analysis performed for the Front Street Project;" $30,462.97—Toledo Coke (10/9/89); $6,251.12—Toledo Coke (10/20/89); $8,070.41—Toledo Coke (11/3/89); $9,295.54—Toledo Coke (1/29/90); $4,215.00—Toledo Coke (5/14/93); $48,-316.93—Toledo Coke (9/23/93); $23,032.23—Toledo Coke (11/3/93); $47,786.11—Toledo Coke (12/3/93). These invoiced costs would be reimbursable with reference to OHM's professional services performed on the Right-of-Way or Toledo Coke property, but not otherwise.

■ Interlake submits a Rule 56(f) affidavit of its counsel to support a request for discovery in several respects. To develop facts to territorially limit the above-invoiced costs (to the ROW or Toledo Coke property), discovery is permissible, if the parties cannot agree on the apportionment of the invoiced costs. Interlake also requests discovery as to the "Partial Receiving Reports" which it says have not been "previously produced" by the City. This request is granted.

Finally, Interlake seeks discovery to determine

[W]hether the invoices from MEC and OHM are reasonable. "Even where costs are found to be necessary and consistent with the NCP, the issue remains whether the costs incurred were reasonable in the circumstances. Costs otherwise necessary and consistent with the NCP may nonetheless be unrecoverable if the steps taken were extravagant or otherwise unreasonably costly." *Northwestern Mutual,* 847 F.Supp. at 401. None of the invoices attached to the City's Motion includes a detailed description of, or backup documenta-

tion regarding, the time and materials for which the City was charged.

Interlake's Resp. at 22.

The *Northwestern* Court, immediately after the above-quoted language, stated: "The record reflects a triable issue of fact in this regard." *Id.* at 401. In the Permanent Injunction trial Interlake offered no evidence to challenge the need for the performance of any of the services described by either MEC or OHM witnesses. Nor does Interlake offer any affidavit to presently support its challenge to the reasonableness of the MEC and OHM services. The affidavit of Interlake's counsel does not suffice. In this state of the record it cannot be said, as in *Northwestern,* that "[t]he record reflects a triable issue of fact in this regard." Hence, Interlake's request for discovery to develop its argument of unreasonableness is denied.

### II.   (C)(1)

Finding that all four elements of *Stychno, supra,* have been established by the City, this court grants its motion for summary judgment as to the matters specified. Accordingly, the court awards response costs as to the amounts indicated, "[b]ecause of the Sixth Circuit rule in *Donahey v. Bogle.*" (City's Mot. for Summ.J. at 20.) As to whether the costs were also "necessary and consistent with the NCP," (*Id.*) the court reserves ruling.

### II.   (C)(2)

Finally, the court considers the City's third argument:

> In addition to rendering summary judgment on the issue of Interlake liability for the City's past response costs and awarding the City those costs, this Court *must* enter declaratory judgment on the issue of liability as to any subsequent action or actions to recover further response costs. *Kelley v. E.I. DuPont De Nemours & Co.,* 17 F.3d 836, 844 (6th Cir.1994).

City's Mot. for Summ.J. at 20–21.

The 6th Circuit there held, in pertinent part:

> The defendants also claim that the district court erred in granting the State declaratory relief to cover future cleanup costs, because any such costs are specula-

tive. The only foreseeable costs, according to the defendants, are the groundwater monitoring expenses and these have been liquidated pursuant to a settlement agreement. Therefore, say the defendants, there was no case or controversy before the district court.

■ We review the district court's entry of declaratory judgment *de novo. Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.,* 791 F.2d 460, 462 (6th Cir.1986). In providing for the recovery of response costs, Congress included language to ensure that a responsible party's liability, once established, would not have to be relitigated:

> In any such action … the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

42 U.S.C. § 9613(g)(2). The entry of declaratory judgment as to liability is mandatory. *United States v. Kramer,* 757 F.Supp. 397, 412 (D.N.J.1991). The fact that future costs are somewhat speculative is "no bar to a present declaration of liability." *United States v. Fairchild Indus., Inc.,* 766 F.Supp. 405, 415 (D.Md.1991).

*Kelley,* 17 F.3d at 844.

■ On the authority of *Kelley,* this court enters declaratory judgment on the "issue of liability as to any subsequent action or actions to recover further response costs." Necessarily, this court is reserving adjudication as to the nature or extent of future removal or remediation.

IT IS SO ORDERED.